# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LISA EVERETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 15-CV-372-JHP |
| ) | |
| PATRICK MURPHY, Secretary of the ) | |
| Department of Army, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

This matter comes before the court on Defendant's Motion for Summary Judgment (Dkt. # 39). Plaintiff filed a response on November 9, 2016 (Dkt. # 47). In her response, Plaintiff indicated she was dismissing all gender based discrimination claims against the defendant. *Id*., at p. 26. The defendant replied on November 23, 2016 (Dkt. # 50).

### Statement of Undisputed Facts

1. Plaintiff, Lisa Everett, began her employment with the Army on April 27, 1987 as a GS-3 Supply Clerk at McAlester Army Ammunition Depot.

2. Everett went through a series of promotions and realignments and eventually became a GS-9, Physical Science Technician, on September 10, 2000. When she began this position, her work hours were 6:30 a.m. to 5:00 p.m., four days a week and her immediate supervisor was Brad Black.

3. Everett alleges that through the years she developed various medical conditions including Seronegative Spondyloarthropathy, Sjorgren's Syndrome, Inflamatory Eye Disease, Chronic migraine/Neuralgic headaches, Cervical Radiculitis and Inflammatory Bowel Disease. Dkt. # 3, at ¶ 8.

4. Everett alleges her symptoms are worse in the mornings and her symptoms can involve morning "auras" or "grogginess." According to Everett, these symptoms can last anywhere from 30-45 minutes or longer after she wakes up. Everett claims the symptoms are not dependent on the time when she goes to bed the night before.

5. In 2000, shortly after becoming a GS-9, Physical Science Technician, Everett requested that her hours be changed from 6:30 a.m. to 5:00 p.m. to 7:30 a.m. to 6:00 p.m., still four days a week. Everett claims she presented a letter from a neurologist, Dr. Savage, which indicated a later start time would help with work functioning.[1] Her supervisor, Brad Black, granted the request.

6. Approximately two years later, in 2002, while still a Physical Science Technician, Everett requested a switch to a "5-4-9" schedule in which she would work nine hours a day for 5 days one week and 4 days the next week. Again, her immediate supervisor, Brad Black, granted her request.

7. In 2004, Plaintiff was promoted to GS-11 QAS at the McAlester Army Ammunition Plant.

---

[1] This letter was apparently not placed in Plaintiff's personnel folder and, therefore, it is impossible to ascertain what the letter actually said. As can be seen from the facts, Plaintiff was, however, given permission to began her work day at a later time.

8. In 2005, Plaintiff became a GS-12 Quality Assurance Specialist. After this promotion, sometime in 2006, Everett requested and was granted another schedule change, in which she worked 8 hour days, five days a week with a starting time between 6:30 a.m. and 9:00 a.m. Initially, Everett reported at 8:00 a.m.; however, this start time slowly evolved until Everett was reporting around 9:00 a.m.

9. In September, 2010, Everett was reassigned to GS-12 supervisory QAS, which did not involve a pay increase but did change her duties and she became responsible for supervising 6-9 employees. Everett's subordinates worked four days a week, ten hours a day starting at 6:00 a.m. Everett made a request to her second level supervisor, Robert Golden, Chief of Staff/Director of Quality Assurance, that she be allowed to maintain her 5 days a week, eight hour schedule. Golden granted her request.

10. Immediately after taking the job, plaintiff moved to Boston, Massachusetts in order to enroll in a course of study at Massachusetts General Hospital. Everett lived in Boston from approximately September, 2010 to March, 2011.

11. Around October of 2011, Supervisor Black had a conversation with Everett in which he expressed concerns about Everett coming in for work three hours after her subordinates. Black tried to convey to Everett that morale among her subordinates was becoming a problem because of her work schedule. At some point, Black suggested Everett appoint someone as a work leader during her absence. Everett disagreed with Black's suggestion and indicated if her schedule was adjusted to conform to that of her subordinates, she might have to take more sick leave.

12. At some point between October, 2011 and the spring of 2012, Black and Everett again discussed aligning her work schedule with that of her team's and "at that point she agreed, but asked that it wait until May when her youngest daughter was out of school as she was currently driving her to school every morning and it would be inconvenient to change at that time." Dkt. # 39-3, at p. 1 ¶ 7.[2] Black agreed to allow the shift change to wait until after school was out.

13. In May, 2012, Robert Golden, Everett's second level supervisor retired or was replaced and Roger Sarter took over as Everett's second level supervisor. Sartor began having concerns that Everett was actually reporting hours as worked when she was not at work, prompting Sartor to ask Black about Everett's schedule. When Black informed Sartor that Everett's schedule began at 9 a.m., Sartor informed Black that "it was inappropriate for a 1st line supervisor of wage grade employees to work a schedule that started 3 hours later than the team." *Id.*, at p. 2 ¶ 8 and Dkt. # 39-4, at p. 1 ¶ 3. According to Sartor, this caused confusion and inefficiency in the work team. As a result, Sartor checked with the human resources office and discovered no reasonable accomodation request was contained in Everett's personnel records.

14. On May 31, 2012, Sartor sent an email to Black indicating, effective June 3, 2012, Everett would be placed on the same standard work schedule as the employees she supervised. Black immediately forwarded the email to Everett. Everett sent a response to Sartor asking him to hold off on the schedule change until she could submit a "new

---

[2] In her deposition, Everett initially stated she was not regularly driving her daughter to school in 2012. Dkt. # 47-1, at p. 133. After being reminded of having asked Black to put off her schedule change until school was out, Everett remembered that her mother-in-law had become a poor driver and Everett had been taking her daughter to school on a daily basis. *Id.*, at p. 134.

formal request for special accomodations" and provide appropriate supporting documentation.

15. On June 3, 2012, Plaintiff began a 4-10 schedule, starting at 6:00 a.m.

16. On June 4, 2012, Plaintiff had a short meeting with Black in which she presented him with some medical records. According to Plaintiff, the medical documentation she had submitted in 2000 from Dr. Savage indicated she needed a change in work shift because of her medical condition. The medical records she presented in 2012, however, did not contain any statement from a medical professional indicating plaintiff required a 5-8 schedule with a 9:00 a.m. starting time or anything to that effect. Dkt. # 39-1, at p. 51.

17. On June 5, 2012, Everett emailed a "reasonable accommodation" request to Sartor and Black in which she requested "an alternate work schedule" or to allow "continuation of M-F 8-hr flextime with core hours of 0830 to 1500 with 2 flexible hours (flexible hours between 0630 to 0830 and 1500-1700), Dkt. # 39-3, at p. 32.

18. On June 22, 2012, Everett submitted a Confirmation of Request for Reasonable Accomodation form to the EEO Manager, Coluah R. Stanfield, at the McAlester Army Ammunition Plant. On June 25, 2012, Mr. Stanfield asked Everett to submit the medical documentation that supported her request.

19. On June 27, 2012, Everett wrote a "Memorandum for Record" indicating she had attempted to retrieve the 2000 statement from Dr. Savage-Edwards, including "a letter regarding [her] medical condition and recommendation for later work shift;" but, she was unable to obtain it.

20. On July 9, 2012, Everett submitted a letter from a Dr. Michael Boyer, M. D., which indicated he had been treating Everett for the following conditions: 1. Chronic neuralgic migraine headaches; 2. Cerviclagia (neck pain); 3. Right shoulder pain from a failed surgery. This letter did not suggest any accomodation was needed or necessary.

21. The only medical records in Everett's personnel file indicating she had ever been placed on work restrictions were from Dr. Rogers, the MCAAP clinic doctor, and Dr. Hawkins, an Orthopedic Specialist. Dr. Rogers indicated, on June 28, 2012, that a lifiting restriction and overhead reaching restriction were appropriate. Dr. Hawkins, however, returned Everett to work "without restrictions" on August 9, 2012. Neither of these doctors indicated or recommended that a change of schedule was necessary for Everett due to her medical conditions.

22. On July 17, 2012, Black emailed Everett indicating he had "yet to receive further medical documentation towards this request as verbally requested." Dkt. 39-3, at p. 2 ¶ 16 and p. 48. Additionally, Black advised Everett to review her information and "forward any pertinent medical professional documentation to support that work shift start time has an impact upon [her] medical condition." *Id*.

23. Thereafter, Everett never provided any documentation to support the need for an altered work schedule. Rather, Everett indicated in emails to Black that she was "only requesting the accommodation as an interim assistance while applying for disability retirement." *Id*., at p. 47.

24. On July 25, 2012, Black again advised Everett he needed a medical opinion necessitating the shift change in order to approve it. However, Black advised he was

6

withholding a decision on Everett's request to give her time to provide the needed medical opinion. *Id.*, at p. 46.

25. On August 6, 2012, Everett requested a "final determination on the documentation submitted." *Id.*, at pp. 45-46. The next day, Black denied her request for accomodation "due to a lack of medical documentation." Black further advised Everett, if she obtained the documentation requested, her accomodation request could be revisited. *Id*.

26. In or around September, 2012, Everett applied for disability retirement.

27. In or around December, 2012, William Tollett (plaintiff's then second level supervisor) offered to accommodate Plaintiff by moving her back into the position where she had previously worked the 5-8 shift without issues; but Plaintiff refused.

28. Plaintiff retired on disability retirement in July, 2013.

## **LEGAL ANALYSIS**

Summary judgment is appropriate where there is no dispute of material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56. When presented with a summary judgment motion, this Court must determine whether there "are any genuine factual issues that properly can be resolved only by the finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When evaluating a motion for summary judgment, this Court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988).

The party opposing summary judgment, however, "may not rest upon mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

Everett alleges claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794. The Rehabilitation Act prohibits the federal government from discriminating against an "otherwise qualified individual with a disability." 28 U.S. § 794(a). Pursuant to this statute, the government has an obligation to provide reasonable accommodations to disabled employees. *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012). To succeed on an ADA claim, the burden rests on a plaintiff to show (1) she is disabled as defined by the ADA; (2) she is "otherwise qualified" to perform the essential functions of the job with or without reasonable accomodation; and (3) she suffered discrimination on the basis of her disability. *Hennagir v. Utah Dept. of Corrections*, 587 F.3d 1255, 1261 (10th Cir. 2009). The substantive standards for determining whether an individual is disabled are the same under both the Rehabilitation Act and the ADA.

As a general rule, it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed. *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996). The federal regulations implementing the ADA describe an "informal, interactive process" through which the employer and

employee will "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999) (en banc) (quoting 29 C.F.R. § 1630.2(o)(3)). Once the employee gives appropriate notice, the employer's responsibilities within the interactive process are triggered. Thereafter, both parties have an obligation to proceed in a good-faith manner to resolve the issue. *Id*., at 1172. "An employee's request for reasonable accommodation requires a good deal of communication between the employee and employer . . . . [B]oth parties bear responsibility for determining what accommodation is necessary." *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633-634 (7th Cir. 1998). Neither party, however, should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. *Beck v. University of Wisconsin Bd. of* Regents, 75 F.3d 1130, 1135 (7th Cir. 1996).

> Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Id*. If an employee refuses to provide medical documentation in response to the employer's reasonable request for such document, the employee will be found to have caused a failure of the interactive process. *Bundy v. Chaves County Board of Commissioners*, 215 Fed.Appx. 759 (10th Cir. 2007)("[B]y failing to respond to the repeated requests for [medical] documentation concerning his ability to return to work,

[plaintiff] never triggered the Board's duty to consider [a reasonable accomodation]."); *Gilliard v. Georgia Department of Corrections*, 500 Fed.Appx. 860, 870 (11th Cir. 2012)(breakdown in interactive process caused by plaintiff who "failed to provide any medical documentation outlining her work limitations or any substantive reason explaining why the proposed alternative accommodation was unreasonable.")

Everett asserts she is a "qualified individual with a disability" as defined by 42 U.S.C. § 12131(2) and that her medical conditions create physical and mental impairments that substantially limit major life activities, including work. When, however, a request was made for Everett to provide current medical documentation regarding her need for a modified work schedule, she refused to provide such documentation instead relying upon a 2000 doctor's note that apparently never made it into her work files and which she was not able to produce. Since medical conditions can change over time, it is not unreasonable for an employer to request updated medical records. An employee who repeatedly fails to provide requested medical updates will be responsible for the breakdown in the interactive process. *See*, *Jefferson v. MillerCoors, L.L.C.*, 440 Fed.Appx. 326, 330-331 (5th Cir. 2011).

> An 'employer need not take the employee's word for it that the employee has an illness that may require special accomodation. Instead, the employer has the ability to confirm or disprove the employee's statement. If this were not the case, every employee could claim a disability warranting special accomodation yet deny the employer the opportunity to confirm whether a need for the accomodation exists.'

*Kennedy v. Superior Printing Co.*, 215 F.3d 650 (6th Cir. 2000)(quoting *E.E.O.C. v. Prevo's Family Market, Inc.,* 135 F.3d 1089, 1094-95(61h Cir. 1998).

10

The undisputed facts in this case indicate, on June 5, 2012, Everett notified her employer that she needed an reasonable accomodation which she described as "Continuation of previously approved work schedule of 5-8's flextime." In making this request, Everett described the following conditions for which accomodation was needed as: "Chronic migraine with cervical, nerve pain, occipital neuralgia, and aura. Non-paralytic orthopedic impairment: chronic pain, stiffness and weakness in right shoulder with some loss of ability to use right arm." Dkt. # 39-3, at p. 29. Everett also submitted a "Memorandum for QA" in which she stated, in part, the following:

> 1. I would like to make the following new Request for Accommodation due to existing and documented health conditions. The request is for an alternate work schedule. An original written request for alternate work schedule for this reason was originally made to you and approved in approximately the year 2000. Since this time you have worked with me on maintaining a schedule which helps to manage my health conditions.
>
> 2. In 2010, Robert Golden discussed with me the conversion of my GS-12 Quality Assurance Specialist position to GS-12 Supervisory Quality Assurance Specialist and asked if I would agree to and accept the re-classification. At this time I asked Mr. Golden if my work schedule could remain in effect, if I accepted the change in classification and additional duties. He assured me that it would.
>
> 3. My earlier request was due to chronic migraine with aura and cervical nerve pain. I experienced increased symptoms upon waking in the morning due to the pressure placed on the nerves when lying down. I also often had poor quality sleep due to these associated symptoms. Therefore, working a later shift allowed time for some symptoms to resolve, when present, and also helped prevent occurrence or exacerbation.
>
> 4. This current request is also due to the continuing condition of chronic migraine with aura and cervical nerve pain/occipital neuralgia and for the additional condition of shoulder pain.
>
> 5. As you are aware, I sustained a work-related shoulder injury on 8/10/11, which was not successfully resolved by surgery (1/15/2012). Post-surgical

> physical therapy did not meet long term goals and I have pain, limitations and restrictions regarding use of my right arm. I also experience increased pain at night, which affects quality of sleep. I do not anticipate this condition changing significantly, as no changes/improvements were achieved in the last 8 weeks of therapy, and Dr. Rogers, Army Occupation Health Physician, has recommended that I obtain another MRI and second opinion from another surgeon. At this time I do plan to obtain a second opinion, but do not anticipate undergoing surgery again in the very near future.

*Id*., at p. 32. Everett continued her memorandum by stating supporting medical records had been provided and were available in the Occupational Health Clinic and requested a 5 day per week, 8-hour flexible shift (5-8's flextime).

On June 25, 2012, Mr. Stanfield, the EEO manager, asked Everett to submit medical documentation that supported her request. Thereafter, as shown by the undisputed facts above, Everett never submitted any medical documentation regarding her need for a reasonable accommodation of a modified work schecule. None of the documents provided in 2012 discussed whether an accomodation would be medically appropriate or necessary. By failing to provide the requested medical documentation, this Court finds Everett was responsible for the breakdown in the interactive process.

Moreover, the Court finds the Army made an attempt to accommodate Everett.[3] Supervisor Tollett suggested Everett move back to a GS-12 non-supervisory position, with the same pay but with the hours she had requested. Everett refused this accommodation. While the ADA requires an employer to "mak[e] reasonable

---

[3]The government claims the Army made two attempts to accommodate Everett. However, one of these attempts occurred before Everett filed her written request for accommodation. Specifically, on Ocotber 12, 2011, Black suggested Everett either report to work during the same shift as the employees she supervised or appoint someone as a work leader during her morning absences. *See*, Dkt. # 39-3, at p. 12. Everett did not like his suggestion and offered to change her schedule to make it conform to that of her subordinates, noting that she might have to take more sick leave.

accomodations to the known physical and mental limitations of an otherwise qualified indidivual," 42 U.S.C. § 12112(b)(5)(A), the proposed accommodation satisfied that requirement. By failing to provide the requested medical documentation and rejecting the proposed accommodation, this Court finds Everett was responsible for terminating the interactive process and, therefore, is not entitled to relief under the ADA.

B. **GENDER DISCRIMINATION CLAIM**

Everett's complaint also alleged claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the Oklahoma Anti-Discrimination Act ("OADA"), 25 O.S. § 1101, *et seq.* Everett's response indicates she is dismissing all of her gender discrimination claims.

## CONCLUSION

For the reasons stated herein, this Court hereby grants Defendant's Motion for Summary Judgment (Dkt. # 39) and dismisses this case.

It is so ordered on this 19th day of December, 2016.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma